UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                              )
UNITED STATES OF AMERICA      )
                              )
          v.                  )   CRIMINAL NO. 09-10357-PBS
                              )
ANTHONY BATES,                )
                              )
               Defendant.     )
_____   )
```

**MEMORANDUM AND ORDER**

November 5, 2010

Saris, U.S.D.J.

Defendant Anthony Bates has moved to suppress a gun and all other evidence seized during a warrantless search of his person and backpack on September 29, 2009.  Among other things, the government argues that all of the facts available to the police at the time of the stop gave them reasonable suspicion that Mr. Bates was engaged in criminal activity, and that police legally seized the weapon when they felt it through the defendant's backpack.  A hearing was held on September 14, 2010 and September 16, 2010.  Boston Police Officers Vincent Stancato and Keith Tolland testified for the government, and the Defendant Anthony Bates testified on his own behalf.  The **MOTION TO SUPPRESS** is **DENIED**.

## I.  BACKGROUND FACTS

On September 21, 2009 a woman called 911 to report a man with a gun.  The woman told the 911 operator that she was at 17

Carney Court in Charlestown and that "my mother called me, my niece was coming over my mother's with the baby and her boyfriend, I think he has a gun in his backpack." (Tr. of 911 Call.)  When asked "why do you think he has [a gun]?" the caller responded: "Because somebody told me, they think that he has one." (<u>Id.</u>)

The caller went on to provide identifying characteristics about the man, including that he was Black, 5'2" with braids, and that he was wearing all black with a blue backpack.  She also reported that she thought the man had a warrant.  After consulting with her mother, who is barely audible on a recording of the call, the caller stated that the man was 24 years old and named Anthony Bates. (<u>Id.</u>)

The caller also provided information about the man's location.  Early on in the call she reported that he was on the street and walking toward a laundromat.  Later, she told the operator that the man was on the corner of Monument Street and the "main road that runs off Monument," and that he was heading toward Sullivan Station where she guessed that he would take the train back home to Attleboro. (<u>Id.</u>)  Then she said that he had changed directions before stopping in front of the "United National Market," where he was smoking a cigarette. (<u>Id.</u>)  Finally, she reported that the police had arrived and that the man was fleeing from officers while they followed after him. (<u>Id.</u>) Throughout this final part of the call, the caller seemed

panicked and eager to provide police with information about the man's whereabouts.

The operator never asked the caller her name.  But throughout the call, the caller provided identifying information. She told the operator that she was currently at 17 Carney Court in Charlestown and that she was the aunt of the man's girlfriend. Twice she stated that she was from Revere.  The operator also obtained other identifying information including the woman's cell phone number, which she entered into the CAD system, through which it was ultimately relayed to the police.

As the call was in progress, police officers began to receive information about the tip over the radio from dispatch and through the CAD system, which provides a short written synopsis of the relevant information and is visible on the computers in police vehicles.  Responding officers included Officer Vincent Stancato and Robert Muller in a marked police vehicle; Officer Keith Tolland in another vehicle; and Officer John Breen, who was performing a police detail nearby.  While driving, Officers Stancato and Muller saw someone fitting the description given by the caller on the corner of Monument Street and Bunker Hill Street.  The man was the defendant in this case, Anthony Bates.  The officers parked their car across the street from the defendant, from which point his head and shoulders were visible to them.  They exited their vehicle, identified themselves and approached him with their guns drawn, ordering him

to drop to the ground.  The defendant turned and began running. Officer Stancato returned to the police car to drive after the defendant, while Officer Muller followed him on foot.  Officers Breen and Tolland joined the pursuit.  The police ultimately caught up to the defendant just after he turned off of Beacon Hill Street onto Concord Avenue.  Officers once again ordered the defendant to the ground, and this time he complied.

There is considerable dispute over how and when the officers ultimately discovered the defendant's firearm.  Officers Breen and Tolland claim that they easily felt the barrel and identified it as part of a firearm as they grabbed the backpack to take it off the defendant's back.[1]  After removing the backpack, the officers opened it, and found what they again perceived to be a gun wrapped in a thin cloth.  They testified that the gun was positioned in the backpack in front of a plastic divider with its barrel pointing up.  They removed the cloth to reveal the firearm.

The police report written by Officer Stancato describes a less clear order of events.  It states:

> Officer J. Breen & Officer K. Tolland from the Ak01F
> car, removed the blue backpack from the suspect,
> effectively separating the suspect from the possible
> weapon.  Officers noted that the backpack was heavy and
> there appeared to be what felt like a weapon inside.

---

[1]  At the hearing, the Court felt the backpack with the gun positioned with the barrel pointing up as Officers Breen and Tolland described and easily felt the weapon when touching the outside of the bag.

> Officer Tolland & Breen opened the blue backpack and observed a heavy object wrapped in a black cloth inside the backpack and upon feeling the black cloth bag the officers felt a long hard solid object which based upon the officers experience, appeared to be the barrel of a handgun. (Ex. 7.)

While this narrative is unclear on the precise chronology, it suggests that the officers felt the weapon just _after_ the man was separated from the backpack.

The defendant's testimony did not address when the police officers discovered the weapon, but it did describe a different orientation of the gun within the bag.  The defendant claims that the gun was wrapped in the cloth and positioned behind the plastic divider with the barrel pointing down.  When the gun was positioned in this manner, the Court could not feel it while touching the outside of the backpack.

The Court finds that officers Breen and Tolland felt the weapon as they were removing the backpack from the defendant's back.  It is not clear if the backpack was still on the defendant's back or if it had just been removed when officers first felt the gun, but either way they felt it during the scrum, when the defendant was still in close proximity to the bag and the weapon.  The Court also finds that the gun was likely positioned in front of the clear plastic divider, not behind it as the defendant testified.  Thus, even if the gun's barrel were pointed downward, the officers would still have been able to feel the weapon through the backpack's exterior.  The firearm at issue

in this case is large and the backpack the defendant was carrying
it in is quite small.  It would have been difficult for officers
not to feel the gun through the bag while removing it from the
defendant.

After discovering the weapon, the officers placed the
defendant under arrest.  He proved to have had a warrant out for
his arrest issued by Taunton District Court on August 6, 2009 for
motor vehicle offenses.

## II.  DISCUSSION

The Supreme Court has held that when a police officer makes
a "brief investigatory stop[] of [a] person[] [or] vehicle[] that
fall[s] short of traditional arrest . . . the Fourth Amendment is
satisfied if the officer's action is supported by reasonable
suspicion that criminal activity is afoot." United States v.
Montiero, 447 F.3d 39, 43 (1st Cir. 2006) (quoting United States
v. Arvizu, 534 U.S. 266, 273 (2002)) (internal quotation marks
omitted).  When law enforcement officers perform a "Terry stop",
they do not need a warrant, but they must "be able to point to
specific and articulable facts which, taken together with
rational inferences from those facts, reasonably warrant [the]
intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968).  The officers
may draw on their experience and training in forming beliefs
about the subject of a stop, Montiero, 447 F.3d at 43 (citing
Arvizu, 534 U.S. at 273), but "subjective good faith" and

"inarticulate hunches" are not enough. <u>Terry</u>, 392 U.S. at 22.

When making an assessment of whether reasonable suspicion exists,

"the facts [must] be judged against an objective standard," the

question being whether "the facts available to the officer at the

moment of the search [would] 'warrant a man of reasonable caution

in the belief' that the action taken was appropriate[.]" <u>Id.</u> at

21-22.

Both the initial stop and the officers' actions after a stop

are subject to Fourth Amendment analysis.  Accordingly, courts

have developed a "two-pronged inquiry," which asks first "whether

the officer's action was justified at its inception, and [second]

whether the action taken was reasonably related to the

circumstances which justified the interference in the first

place." <u>United States v. Am</u>, 564 F.3d 25, 29 (1st Cir. 2009)

(citations and internal quotation marks omitted).

At issue in this motion are both the constitutionality of

the initial stop and the constitutionality of the officers'

seizure of the guns and ammunition from the defendant's backpack.

After considering the evidence presented, the Court concludes

that both withstand constitutional scrutiny.


A.    <u>Constitutionality of the Stop</u>

The defendant argues that the initial stop in this case was

unconstitutional because it was based on an unreliable anonymous

tip that did not refer to any specific illegal activities, and that the defendant's flight in response to the officers' initial approach with their guns drawn cannot give rise to a reasonable suspicion of criminal activity.

   **1) Anonymity of the Tip:**

   In <u>Florida v. J.L.</u>, the Supreme Court considered whether an anonymous tip to police officers that a young black male wearing a plaid shirt and standing at a bus station had a gun gave rise to a reasonable suspicion of criminal activity that justified officers' temporary detainment of a person fitting this description. <u>Florida v. J.L.</u>, 529 U.S. 269, 269-70 (2000). The Court found that the tip lacked even "a moderate indicia of reliability" and "left the police without means to test the informant's knowledge or credibility." <u>Id.</u> at 271. Therefore, without any more information suggesting the possibility of criminal activity, the police did not have an objectively reasonable suspicion to justify a <u>Terry</u> stop.

   The tip at issue in this case was anonymous to the extent that neither the police officers nor the 911 call operator knew the identity of the caller. It thus lacked the reliability of a tip received from someone known to police, but it also contained certain identifying information not present in <u>J.L.</u>, like the tipster's location, place of residence, and her relationship to the subject of the tip. The question is whether a tip that

8

provides this kind of information, but does not provide the identity of the tipster, can give rise to a reasonable suspicion justifying a Terry stop.

The First Circuit has described three different categories into which a tip may fall. See United States v. Montiero, 447 F.3d 39, 44 (2006).  The first category is illustrated by the Supreme Court decision in Adams v. Williams, 407 U.S. 143 (1972). In that case the Court held that a police officer had a reasonable suspicion of criminal activity based solely on an "in-person tip from a person 'known to him.'" Montiero, 447 F.3d at 44 (quoting Adams, 407 U.S. at 144-45).  According to the First Circuit, a tip in this category, where the tipster is reliable and known by police, "may in certain circumstances be sufficient to warrant a Terry stop." Montiero, 447 F.3d at 44.

The second category is made up of cases where the police are not familiar with the tipster but where they do have certain external indicia of reliability.  This category is illustrated by the Supreme Court's decision in Alabama v. White, 496 U.S. 325 (1990).  There the Court held that an anonymous tip that included certain predictive information about what the subject of the tip would be doing in the future, like that she "would be leaving 235-C Lynwood Terrace Apartments at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be going to Dobey's motel and that she would be in possession of about an ounce of cocaine," justified a Terry stop.

9

Montiero, 447 F.3d at 44 (quoting White, 496 U.S. at 327)
(internal quotation marks omitted).  This tip was sufficiently
reliable first because the specific predictive information
reflected the caller's "special familiarity with" the subject of
the tip and second because this information about future activity
was "significantly corroborated." Montiero, 447 F.3d at 44
(quoting White, 496 U.S. at 331-32).

A tip like the one in J.L. falls into the third category.
See Montiero, 447 F.3d at 44.  Unlike tips of the second
category, which are also anonymous, tips in this category are not
corroborated by any other information available to the police.
In J.L. police determined that there was, in fact, a person
matching the description given in the tip standing where the
tipster said he would be standing.  But this alone suggests
merely that the tipster can identify the subject, not that she
has any basis for suspecting criminal activity. See J.L., 529
U.S. at 272.

This framework gives rise to two questions: first whether
the tip in this case was truly "anonymous," and second, if it was
anonymous, whether it was corroborated to an extent that it
exhibited "sufficient indicia of reliability to provide
reasonable suspicion to make the investigatory stop." White, 496
U.S. at 329; see Montiero, 447 F.3d at 45 (presenting the same
two-step analysis).  It is important, however, not to engage in
this inquiry in the abstract.  The question is ultimately whether

the police had a reasonable suspicion that criminal activity was afoot, and the touchstone of the analysis is whether "in light of all the circumstances" the "[tip] possessed sufficient indicia of reliability." United States v. Ruidiaz, 529 F.3d 25, 31 (1st Cir. 2008).

In light of all of the circumstances, the tip here was sufficiently reliable to give rise to a reasonable suspicion. Even though the caller did not provide her name, she gave enough identifying information that her tip was not anonymous under the Montiero framework.  In Ruidiaz the First Circuit held that "not every report from a nameless source is truly anonymous." Id. at 30.  In that case the fact that the tipster "confirmed his telephone number and agreed that the police could call him back" along with the fact that "the police were well aware of the trace capabilities of the 911 system, so they knew that a caller could be tracked down if he provided false information" provided certain reassurances of reliability. Id.  Here, the caller did not expressly invite police to return her call, but she did provide them with her current location on Carney Court and her place of residence as Revere.  Moreover, the operator had access to the caller's phone number, and this information was relayed to police through the CAD system.  Given current cell phone and caller ID technology, it is likely, even, that the caller knew that her number from a cell phone could be traced easily by police.  This all suggests that she did not intentionally conceal

11

her identity from police in order to prevent them from "h[olding] her responsible if her allegations turn[ed] out to be false." J.L., 529 U.S. at 270.

Officers' access to information about how the tipster knew the defendant also mitigated her anonymity and provided police with a means of evaluating her reliability.  In J.L., the Court noted that the tipster had not "supplied any basis for believing he had inside information about J.L." Id. at 271.  Without information about how a tipster knows the subject of his tip, police have nothing to go on but the "bare report[s] of unknown, unaccountable informant[s]." Id.  Here, on the other hand, police officers knew that the tipster's niece was the defendant's girlfriend.  They also knew that the tipster was on the street watching the defendant and reporting his movements in real time. Even though the tipster was unknown, this information provided officers with the basis for the tipster's knowledge and a means of evaluating her credibility.  This is a far cry from the typical anonymous tip situation involving an unknown tipster providing unsubstantiated information completely out of context.

The defendant argues that the tip at issue in this case is particularly unreliable because the tipster did not have actual knowledge of criminal activity but relied on another source, seemingly her mother.  Indeed, the First Circuit has noted that tips relying on hearsay statements are inherently unreliable: "While the police or a 911 operator often can make some rough

12

judgments about the age, cognitive ability, and motivations of an
anonymous informant based on her tone of voice. . . or appearance
and demeanor. . ., the police [in hearsay tip situations] have no
way of knowing the state of mind of the informant when she gave
her information, or whether she was a person who could be relied
on to relate events accurately." <u>Montiero</u>, 447 F.3d at 46.  The
tip at issue here, however, is not the typical hearsay tip.   In
<u>Montiero</u>, the tipster reported that a relative of his had
witnessed criminal activity involving the defendant. <u>Id.</u> at 41.
Not only did the tipster refuse to give any information about his
relative, but the police were aware that the tipster had a reason
to fabricate allegations against the defendant. <u>Id.</u> at 46.  In
this case, the police knew that the person with actual knowledge
of the defendant's possession of a firearm was the tipster's
mother; they also had reason to believe that the mother was
present with the tipster while she was on the phone with police;
and a recording of the call reveals that the mother's voice is
actually audible.

Finally, the circumstances of the call must be taken into
account.  The First Circuit has noted that courts should give
"special weight" to anonymous tips where public safety may be at
risk, including tips involving emergency 911 phone calls. <u>See
Ruidaz</u>, 529 F.3d at 31 n.2; <u>Montiero</u>, 447 F.3d at 49.  Where
there is no time to investigate a tip before making a stop,
police must be able to rely on anonymous tips alone as long as

those tips reflect certain minimal indicia of reliability, as is the case here.

**2) Content of the Tip:**

In order to make a <u>Terry</u> stop the police must have reasonable suspicion that "criminal activity is afoot."  Here the tip may have given police reasonable suspicion that the defendant had a gun, but on its own it did not support an allegation of criminal activity.  In Massachusetts, mere possession of a firearm is not a crime. <u>See</u> <u>United States v. Collins</u>, No. C.R.A. 02-10152-RWZ, 2003 WL 21212743 at *2 (D. Mass. May 23, 2003) (citing <u>Commonwealth v. Alvarado</u>, 667 N.E.2d 856, 858 (Mass. 1996)).  In this sense, the tipster's allegations alone here are "no different than if [she] had told the 911 operator that [the defendant] possessed a wallet. . . .  Though a search of that wallet may have revealed counterfeit bills. . ., the officers had no reason to stop [the defendant] based merely on information that he possessed a wallet, and the seized bills would have to be suppressed." <u>United States v. Ubiles</u>, 224 F.3d 213, 218 (3rd Cir. 2000).

On the other hand, reasonable suspicion is not probable cause, and it does not require police to eliminate all innocent explanations for a person's conduct before stopping him. <u>See</u> <u>United States v. Gould</u>, 364 F.3d 578, 593 n.17 (5th Cir. 2004). Though the police may not have had justification to stop the

defendant on the tip alone, other circumstances may have given them the requisite suspicion.  In cases involving tips asserting that someone had a gun when mere possession was not a crime, courts have held that other circumstances along with the possibility of a firearm can give rise to reasonable suspicion. See, e.g., United States v. Velentine, 232 F.3d 350, 356 (3rd Cir. 2000)(finding that the defendant's presence in a high-crime area at a 1:00 am, along with officers' suspicion that he had a weapon was sufficient to give rise to a reasonable suspicion); Commonwealth v. Depeiza, 449 Mass. 367, 370 (2007)(citing a number of additional factors including the defendant's location, the time, and his gait).

There is no indication that any of these circumstances were present when officers first approached the defendant with their guns drawn, but that initial interaction did not constitute a stop subject to constitutional scrutiny.  The police were acting within their authority when they approached the defendant even if they did not initially have a reasonable suspicion of criminal activity. See Florida v. Bostick, 501 U.S. 429, 434 (1991).  Of course the police in this case did more than approach the defendant to ask questions; they walked toward him with guns drawn and ordered him to the ground.  As the defendant acknowledges in his brief, however, even these actions do not yet constitute a stop because the defendant did not actually submit to police authority. (Def. Brief at 6.)  In California v. Hodari

D., 499 U.S. 621 (1991), the Supreme Court held that a seizure under the Fourth Amendment has not occurred until the police "either [apply] physical force. . .or, where that is absent, [the suspect] subm[its] to the assertion of authority." Id. at 626. Here the defendant was not seized until he submitted to police authority on Concord Street after attempting to flee from his original interaction with the police.  The fact that the police initially approached the defendant with their guns drawn may be a show of force that has some bearing on the constitutional issue here, but it did not constitute the "laying on of hands or application of physical force" required in Hodari D.. Id. at 625; see also United States v. Waterman, 569 F.3d 144, 146 (3rd Cir. 2009)("While [police officers drawing their guns] definitely constituted a display of force, we conclude that it fell short of the physical force required under Hodari D.."); United States v. Johnson, 212 F.3d 1313, 1314 (D.C. Cir. 2000)(finding that a stop had not occurred when police officers approached a suspect with their guns drawn and ordered him to raise his hands).  Attempted seizures of a person are generally beyond the scope of the Fourth Amendment.  Thus, this initial interaction does not have any constitutional significance on its own. See Hodari D., 499 U.S. at 626 n.2; Cnty. of Sacramento v. Lewis, 523 U.S. at 844-45 (1998).  And the question is whether subsequent events, namely the defendant's flight, provided police with a reasonable

16

suspicion of criminal activity that was not supported by the tip alone. See United States v. Simmons, 560 F.3d 98, 106-107 (2nd Cir. 2009)(collecting cases where grounds for a stop may be based on events that occur after the order to stop is given).

**3) The Defendant's Flight**

The Supreme Court has held that flight from police may give rise to a reasonable suspicion even if officers would not have otherwise had justification for making a stop. See Illinois v. Wardlaw, 528 U.S. 119, 124-25 (2000).  This rule is derived from the general principle that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Id. at 125.  There is no obligation to cooperate with police, but "unprovoked flight is simply not a mere refusal to cooperate."  Id. "It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. at 124.

Even if the tip that the defendant had a firearm, which is not in itself a crime, would not give rise to reasonable suspicion that criminal activity was afoot, the defendant's flight in addition to this information justified the stop.  In United States v. Muhammad, 463 F.3d 115 (2nd Cir. 2006), the Second Circuit found that a truly anonymous tip under J.L. could be corroborated by "evasive conduct," in that case, a defendant's efforts to speed past a police cruiser attempting to stop him on

17

his bicycle. Id. at 123.  The court recognized that "reasonable suspicion" is derived from the "totality of the circumstances." Id. at 125.  It may have been that the anonymous tip did not provide enough information to justify a stop, but once the defendant evaded police, the likelihood that he was engaged in criminal activity increased.

Similarly, in this case, when they approached the defendant, police only had information that he had a firearm and a possible outstanding warrant.  However, once they ordered the Defendant to surrender and lie on the ground, and he responded by fleeing from three officers following on foot and one in a police cruiser, police had a sufficient basis for believing that criminal activity was afoot. See Depiza, 868 N.E.2d at 97 (2007).

The Defendant points out that his original interaction with the police was much more intimidating than the average police inquiry, and argues that these circumstances complicate the assumption that his flight was indicative of criminal activity, as opposed to, say, fear.  It is certainly true that there is no bright line rule providing that flight alone is always sufficient for reasonable suspicion.  After all, the Supreme Court has instructed that assumptions about the import of a suspect's flight are grounded in "commonsense judgments and inferences about human behavior." Wardlaw, 528 U.S. at 125.  If the only basis for the stop had been the fact that the defendant fled from the police when they approached with their guns drawn, the stop

18

may have been unconstitutional.  But given all of the information
available to police by the time they stopped the Defendant on
Concord Street, officers had a reasonable suspicion that the
defendant was engaged in criminal activity.  They had received
information they believed to be reliable that the defendant had a
weapon, and they also observed the defendant flee in response to
their approach.  Moreover, the Defendant engaged in prolonged
headlong flight over the course of a few blocks, behavior at
least suggestive of criminal activity. See <u>United States v.
Franklin</u>, 323 F.3d 1298, 1302 (11th Cir. 2003)(taking into
account the "nature and duration" of a suspect's flight in
determining that it justified a <u>Terry</u> stop).  Any single piece of
information available to police may have been insufficient to
justify the stop, but "the totality of the circumstances" gave
rise to a reasonable suspicion.

**B.   <u>Constitutionality of the Recovery of the Weapon</u>**

The Defendant argues that even if the seizure was
constitutional at its inception, officers unlawfully searched his
backpack to recover the gun.

There is no question that the officers were justified in
frisking the defendant.  "[I]n determining whether a pat-down
search is an appropriate step following a valid <u>Terry</u> stop, the
key is whether, under the circumstances, 'the officer is
justified in believing that the person is armed and dangerous to

the officer or others.'" <u>United States v. Romain</u>, 393 F.3d 63, 71 (1st Cir. 2004)(quoting <u>United States v. Schiavo</u>, 29 F.3d 6, 8 (1st Cir. 1994)); <u>see also</u> <u>United States v. Soares</u>, 521 F.3d 117, 120 (1st Cir. 2008).  In this case officers had reason to suspect that the defendant was carrying a weapon, and they patted him down to ensure their own safety.

The Defendant argues, however, that the frisk of the backpack was only legal up until the point when it was removed from his body.  In <u>United States v. Pardue</u>, 385 F.3d 101 (1st Cir. 2004), the First Circuit agreed with the district court's finding that where there was no "particularized safety concern," and an officer could not perform a warrantless search on a suspect's backpack after that backpack had been removed from the suspect and placed on the trunk of the police cruiser while the suspect was sitting in the rear of the cruiser. <u>Id.</u> at 105.

It is true that after a threat to officer safety is removed, officers no longer have the authority to frisk a suspect for weapons. <u>See</u> <u>Terry</u>, 392 U.S. at 26 (Officers' protective search must be "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.").  But this rule cannot be applied rigidly, particularly in situations where a stop and frisk must happen quickly.  The officers here, could not have patted down the defendants' backpack for the first time after it had been removed from his body and was sitting at some distance away from him.  But there

is no requirement that the officers carefully remove the backpack
without feeling its contents.  Here officers first felt the
firearm through the outside of the backpack when they were
removing it from the defendant or immediately afterwards.  At
that point they had not yet completely removed the threat to
officer safety.

The resulting question is whether the officers were
justified in retrieving the firearm from the backpack after the
threat to officer safety had been removed.  Under the plain-feel
doctrine, "[i]f a police officer lawfully pats down a suspect's
outer clothing and feels an object whose contour or mass makes
its identity [as contraband] immediately apparent," the officer
can seize the object without a warrant.  <u>Minnesota v. Dickerson</u>,
508 U.S. 366, 375 (1993); <u>see also</u> <u>United States v. Proctor</u>, 148
F.3d 39, 43 (1st Cir. 1998).  In order to legally seize an object
plainly felt during a valid search, however, officers must have
"probable cause to believe that the item is contraband."
<u>Dickerson</u>, 508 U.S. at 376.  Here, whether or not the firearm was
positioned with its barrel up (as the police officers testified)
or its barrel down (as the defendant testified), the police
officers would have been able to clearly identify it as a firearm
by feeling the outside of the backpack.  But, as discussed above,
not every concealed firearm is illegal contraband, and although
the police officers may have had a reasonable suspicion that the

defendant had a committed crime, it is more difficult to say that they had probable cause to believe that the gun they felt in the backpack was illegal.  There is no evidence that at the time of the stop police knew of any of the circumstances, like the defendant's prior conviction and prison sentence, that made his possession of a gun illegal, but police did have access to information that would have at least suggested the gun's illicit status.  After all, although it is possible that the defendant fled from police because of his outstanding warrant, there is no evidence that he even knew about the warrant, and it seems more likely that he ran from them because of the firearm in his backpack.  Although it is a much closer call, the Court finds that the circumstances giving rise to a reasonable suspicion that criminal activity was afoot, plus the fact that, upon feeling the backpack, the officers knew the defendant indeed had a weapon, gave rise to at least a "probability or substantial chance" that the firearm in the backpack was illegal. Illinois v. Gates, 462 U.S. 213, 245 n.13 (1983)(defining "probable cause" for determining whether a warrant can be issued).

The fact that this belief was grounded in circumstances unrelated to the actual tactile sensation of the gun is irrelevant.  The plain-feel doctrine does not justify the seizure of objects only determined to be contraband after searches that exceed the legal bounds of a Terry stop. See Dickerson,508 U.S. at 378 ("[T]he officer's continued exploration of respondent's

pocket after having concluded that it contained no weapon was unrelated [to the justification for the search].”). But all legally obtained information can form the basis for a determination that an object is contraband.  Here the officers legally acquired information suggesting the defendant had an illegal firearm, and legally felt the backpack as they were removing it from the defendant.  They were, thus, justified in seizing the firearm even after removing the backpack from the defendant's body.

Even if the officers were not justified in seizing the firearm under the “plain-feel” doctrine, it should not be suppressed because the police would have inevitably discovered it when they arrested the defendant on his default warrant.  Under the inevitable discovery rule, evidence discovered through unconstitutional means is still admissible if the prosecution can show that police would ultimately have discovered it notwithstanding the constitutional violation. See <u>Nix v. Williams</u>, 467 U.S. 431, 447-48 (1984); <u>United States v. Zapata</u>, 18 F.3d 971, 978-79 (1st Cir. 1994).  The First Circuit has developed a three-part test for determining whether evidence falls within the inevitable discovery exception:

first whether the legal means [are] truly independent;

second, whether both the use of the legal means and the discovery by that means are truly inevitable; and,

third, whether the application of the inevitable discovery exception either provides an incentive for police misconduct or

23

significantly weakens fourth amendment protection.

Pardue, 385 F.3d at 106 (citing cases)(internal quotation marks
omitted).

Testimony in the suppression hearing revealed that the
discovery of the weapon would have been truly inevitable.  As
Officer Stancato testified, even if they had not discovered the
weapon on the scene, police would have discovered the Defendant's
warrant after they ran the defendant's name through their warrant
check system available in the police cruiser.  They then would
have arrested the defendant on the warrant and would have
discovered the firearm when booking him on that arrest.  See
Pardue, 385 F.3d at 107 ("[T]he ammunition would have been
discovered in the backpack [upon arrest] by way of a routine
search of personal belongings.").

The arrest and discovery would also have occurred entirely
independent from the discovery of the weapon upon feeling the
defendant's backpack. From the 911 call the police had
information about both the defendant's identity – which would
have enabled them to run a warrant check – and the fact that he
had a warrant – which would have justified running a warrant
check as part of the investigatory stop.  But even if the police
did not know the Defendant's identity and had no idea that he had
a warrant, they would have been justified in investigating these
issues as part of the stop.  Police performing Terry stops are
clearly justified in inquiring into a suspect's identity. See
Hiibel v. Sixth Judicial Dist. Court, 542 U.S. 177, 186 (2004)
("Our decisions make clear that questions concerning a suspect's

24

identity are a routine and accepted part of many <u>Terry</u> stops."). And although this Circuit has not explicitly found that warrant checks are necessarily within the scope of all investigatory stops, it has acknowledged that "most circuits have held that an officer does not impermissibly expand the scope of a <u>Terry</u> stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention." <u>Klaucke v. Daly</u>, 595 F.3d 20, 26 (1st Cir. 2010).  Therefore, even if they had not discovered the firearm after opening the defendant's backpack, police would have been justified in running a warrant check on the defendant upon stopping him on Concord Street and would have then arrested him and discovered the weapon through independent and lawful means.

Finally, there is no danger that allowing the evidence in through the inevitable discovery exception would "provide[] an incentive for police misconduct or significantly weaken[] fourth amendment protection."  Even if the police did invade the defendant's Fourth Amendment rights, which this Court does not believe, they did not do so intentionally, and this prong of the exception must be applied with appropriate weight given to the severity of the exclusionary rule. <u>See</u> <u>Pardue</u>, 385 F.3d at 107.

<u>Conclusion</u>

Defendant's motion to suppress is <u>denied</u>.


/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge